I'm Richard Rodgers, representing Mr. Churchill. Do you mind if I get right to the heart of this? Please. As I understand your theory, or the one that to me has colorable teeth to it, it's that the magistrate judge didn't connect the dots between the allegedly anticipatory repudiation of the contract and the consequences of it. Is that it? That's the whole issue. Did you offer a form of verdict which would have connected the dots? I offered a jury instruction on it. It wasn't my question. I understand. And I'm trying to remember, and I don't remember that we presented – I don't remember the verdict forms. I simply don't. Well, as I understand them, one asked whether Winter had, in essence, anticipatorily repudiated the contract or breached the contract, and the answer was yes, right? Yes, I think so. And then, but the second question asked them whether they were excused from breach or whether your client left early, in essence, right? I don't remember the – I'm trying to remember the verdict forms, and I'm just totally unprepared on that. It's probably in there. It could have been that we prepared the verdict forms after the – no, because he's – at the last minute, he changed his mind. The first question said, did Winter Shiverly breach the employment contract with Churchill in the absence of any excusing circumstances, and their answer was yes. Okay. The second question was, did Winter Shiverly owe Churchill a bonus under the terms of the agreement, and the answer was no. Right. But the judge is to accept your theory, which has some resonance in California law and under Civil Code 1440, shouldn't they have been given the opportunity to say what the consequences were of Winter's breach? It seems to me what I wrote the brief on was the instructions. They were essentially given a directed verdict by saying if he resigned voluntarily, he wasn't entitled to the bonus. But I don't remember what the jury verdict forms were that I proposed prior to that. Your argument is, is that the jury instructions you offered, if accepted, would have cured the problem of connecting the dots. Yes. Okay. And the instruction you were talking about is that David Churchill was entitled to his 2003 bonus only if his separation from Winter Shively was involuntary. That's the key. Well, then, may I ask you a question? Doesn't the word annual bonus equal to a percentage of the federal taxable income implicitly require distribution at the close of each fiscal year? Now, anticipating your anticipatory breach argument, that's your total argument. Yeah. It seems to me that the whole issue in the case is whether Mr. Churchill forfeits his earned bonus by resigning after the anticipatory breach. And since he has the election to treat it as a breach and sue and further performance is excused, I don't see any other issue. If the annual bonus is implicit, I'm not sure that's sufficient under California law, but I don't really see it as a determinative issue. It seems to me under California law that most of the cases have had to do with explicit language. You have to be there at a specific date in order to get the bonus. And somebody resigns after the performance, but before that date. Or there's explicit language that you have to have worked through the end of the year in order to get the bonus. I don't remember anything saying that it's implicit in the contract. I think it has to be spelled out. And then you have the lucien. I'm not sure how to say that word. But lucien, or you've got that exception where when the bonus is the big inducement for employment, you can't. Well, let me ask you about that. Couldn't every bonus be regarded as an inducement? I mean, where would you ever draw the line? Explicit language. And the explicit language in this case is? The explicit language would say you have to be employed at the end of the year in order to receive your bonus. Language would have to be in the negative. Basically, unless you stay the whole year, you don't get the annual bonus. I would think. Can you say what the bonus... I was wondering if it's just implicit that the bonus is annual because it's based on net profit. And ordinarily, your books are based on a year. Yeah. You could do that. Otherwise, it's just infinitely manipulable because of financing and orders and when you pay for cars and all that sort of thing. I understand. But bear in mind that in this case, he was paid a portion of the bonus on a monthly basis. So the parties weren't contemplating that the bonus would be payable at the end of the year. They were contemplating that he would receive a portion of it every month and that at the end of the year, they'd figure out what the remainder was. Again, if you... I think it's so redundant. I read my brief and I apologize. I could have said what I said in five pages. I didn't need 14 in the reply brief. Assume, arguendo, that he had to stay through the end of the year. I mean, that's basically what the trial judge said, is he had to stay through the end of the year because resigning is a forfeiture. And if he had to stay through the end of the year and there's an anticipatory breach under California law, that excuses staying until the end of the year. That's what civil code section 1440 says. That's what the cases say. That's what Romano says. Romano versus Rockwell distinguished California law from the federal cases, Ricks and whatever they were, by saying that the employee has the option to treat it as an anticipatory breach and immediately sue, but he does have the option to stay. And that's California law. He, Mr. Churchill, had the option to treat it as a breach and to stop, and he doesn't forfeit. I was wondering if it worked out a little differently under the California cases, and you have to educate me on this. I was thinking the bonus is basically profit sharing. Originally she was going to give him stock, discovered she couldn't because of the way her husband's estate plan was structured with those trusts. So instead, he was basically getting a share of profits, and that was his bonus. And he got the profits and gets the profits until he quits. Now, the California cases say that if your employer fires you so they don't have to give you your annual bonus, or if they conduct themselves in such a way as to amount to a constructive termination, then you get your bonus anyway, because you would have worked for the whole year. But here, where it's really profit sharing, it seems like all the anticipatory repudiation would do is maybe give him the right to get the Ford dealership. I think that was the other dealership he got, or something like that. He didn't get another dealership. They didn't get that dealership. I'm trying to get a handle on, I suppose in a profit sharing sense, that then you would say he's entitled to sharing the profits up until the time that he leaves. If you're going to disregard the contractual land- I'm sure he's not making money for them anymore, so he didn't get a share. Right. So he's entitled- we don't claim that he's entitled to a bonus for profits after he left. We claim that he's entitled to a bonus for the portion of the year that he was there. Oh, you just want the bonus for January through July? Right. Oh, that wasn't clear from your brief. I'm sure that you were asking for the whole year. No, if you look at the record, you know, the portions of the record that we submitted. But the computation of the bonus was an unresolved issue in the trial court. And I think that you- What happened on January through July? As I understand it, he got something monthly that was based on what it was anticipated one-twelfth of the annual bonus would be, more or less. No. He got- I can't remember. It's one-third of one-twelfth. He got a small portion. I can't remember whether it was- Raw, right? Well, he gets $8,000 plus a portion of the bonus. And I want to say $5,000, but that seems low. But say that he got a third of what the monthly bonus would be. They were retaining at least two- no, I don't want to say at least two-thirds. They were retaining more than half of what the annual bonus would be until it was calculated at the end of the year. But they were paying some portion of it to Mr. Churchill on a monthly basis. And I think that it was a standard amount. I mean, I don't think it depended on the profits of the particular month. Would he have had to return it if there were no profits at the end of the year? That's a hypothetical that doesn't make sense because they had profits. I mean, they were paying them because there were profits every month. I don't think that they pegged the amount. A small portion, as you said. They were not paying in- They would have to- I mean, something would- there would have to be a- I suppose if in January they paid him $10,000 and then the rest of the year slid, maybe they could make a claim that he has to pay the $10,000 back. I don't know. I was just trying to figure out how binding all of this was. By the time you got to trial, the numbers were known, weren't they? Oh, yeah. The numbers were known way before we got to trial. It looked to me like you submitted joint verdict forms. I looked it up after Judge Hawkins asked the question. Is that right? I don't remember. I recall- what I recall about it is that the judge changed his position just before the jury instructions. And I only recall that because I was reviewing the excerpts last night. Sorry, go ahead. If he changed his mind at the last minute, we must have submitted joint verdict forms before he changed his mind. So, as I say, I'm not prepared on the joint verdict forms. I didn't even think about it. His time is- Thank you, counsel. Unless my colleagues have more questions. Thank you, Your Honors. Good morning. My name is Joshua Cliff and I'm representing Appellee Winter Chevrolet. If I could just address a couple of issues that were raised a minute ago, and specifically Judge Hawkins' question about the joint proposed verdict forms. Could you talk just a little louder? Absolutely. I'm sorry. On page 67 of Appellant's excerpts of record is the joint proposed verdict forms. And these were proposed jointly and you can see that the verdict form proposed by both sides does not. Well, first and number two, it does- Is this 0067 of Appellant's excerpts of record? Correct. My copy at the top says, Winter Chevrolet's proposed verdict form. If you look at the page before, though, I think that may have been a typo, because if you see the caption, it's the joint proposed verdict forms. And also in the caption, Mr. Rogers' name appears. The judge did ask that we meet and confer about these proposed verdict forms, as well as the jury instructions beforehand. And we did jointly submit verdict forms and jury instructions. Did the jury instructions, as given the jury, comport with Civil Code 1440 and what the California Supreme Court has said in Romano about anticipatory repudiation and the options of a person who believes the contract has been anticipatorily repudiated? They did, Your Honor. The final jury instructions had an instruction that had this concept of anticipatory breach there. This was a part of the bigger contract dispute, but it was a final jury instruction. The jury instructions specifically told the jury that if they found that Winner Chevrolet had breached the agreement and had no excuse for breaching the agreement, then Churchill had the option of either treating that as an anticipatory repudiation and to immediately sue for damages without any requirement that he complete the terms of the contract, or to treat it as Romano describes it, as an empty threat and continue to serve until the end of the contract. They were told that. They were told that, Your Honor. Instruction. Can you tell me where you can find that instruction? I can. It is on page 126, 0126 of, again, Appellant's Excerpts of Record. And at the top of that page, it says, if David Churchill proves that he would have been able to fulfill the terms of the contract. 126? 126, I'm sorry. Go ahead. Starting again, if David Churchill proves that he would have been able to fulfill the terms of the contract and that Winter Chevrolet clearly and positively indicated by words or conduct that it would not or could not meet the contract requirements, then Winter Chevrolet breached the contract. And this was a key part of the trial. Mr. Churchill's theory throughout the trial was that there was this conversation in 2003 that Mrs. Winter had with Mr. Churchill when she told him, there's going to be no further agreement from me. I've given you everything that I'm going to give you, essentially. I don't see in this instruction what I would call the Romano option. Can you tell me where that is? Well, I think we were very specific with the words that we used because it came up in this factual context of the case of the supposed conversation that happened in 2003 where Mrs. Winter supposedly said these things to Mr. Churchill that would have arose to an anticipatory breach. So the parties, and I think Judge Spiro as well, agreed that rather than use concepts like anticipatory breach, which are a little bit abstract, that we would give it a concrete meaning to say essentially that if Mrs. Winter came to Mr. Churchill and said definitively, we're not going to perform, then that would be a breach and then he would have his rights to look at it. Here's my question. You pointed me to an instruction which does tell the jury that if Winter breached, that Churchill's performance is excused. What I'm asking and what I'd asked before was whether it told the jury of what I would describe as the Romano option. In other words, if they conclude that Winter Chevrolet breached and had no excuse for the breach, that assumes there was a contract. Then Churchill had two options. One, he could treat the contract as having been repudiated and he doesn't have to perform under it, or two, he could treat it as an empty threat and continue to work. Right. And I think with that instruction, it gets to that. And that's what both parties argued to the jury. That was the main theory from both sides. Winter Chevrolet's argument was that he did have the option of continuing his employment. They had worked out a new agreement to replace the initial agreement that they weren't able to fulfill because of these legal issues with the estate. And that there was a right of first refusal that was in the works at the time that Mr. Churchill resigned. And it was our theory that this was a conscious decision on Mr. Churchill's part. He had a mistaken belief about what the initial contract meant and the benefit to him. And so he made the decision, not because of this breach, but because he decided to say, I'm going to make a push to try to get this better agreement out of Mrs. Winter at a time when the dealership was under a lot of stress, due to various reasons. I want to make sure I understand a couple of things. I had thought that the whole case was about the annual bonus. And I guess I was influenced a little because the judge's instruction said, the court has determined that David Churchill was entitled to his 2003 annual bonus, only if the separation from Winter Chevrolet was involuntary. He quit right after the July 4th weekend. And the judge said, well, under California law, that's that. If that's a voluntary termination. But we just learned this morning that he's saying, no, no, no. I don't want my bonus for the whole year. I want it through July when I quit. Did the instructions allow for that? How was that put at issue in the trial? I think that there is the proposed verdict form that went to the jury, which again we referenced before on page 67. That's verdict form number three. I don't see a number on it, Your Honor. Are you looking at ER 144? I'll tell you, it's correct. Which one should I look at? I guess we can look at page 147, where it was actually filled out. That's where I have it. And I have it as verdict form number three. The jury concluded that Winter did not owe David Churchill a bonus under the terms of the employment agreement. Correct. And I think this issue of proration, we didn't necessarily put this to the jury. I think it was the decision of the parties and the court that first we would determine, because the main issue was whether the bonus had been earned. And then once the jury made that determination, the court asked the parties to get together and calculate what that amount would be based on Mr. Churchill's theory of proration. He did argue the theory of proration at trial. I don't believe so, no. The key issue and the issue that was put to the jury and at which the parties agreed would be whether the bonus was earned. Now, I frankly don't think that it's appropriate to give a prorated bonus. Why not? Well, because I think the conduct of the parties and the contract that they entered into show that they didn't contemplate a prorated payout. Because when I look at the, I think it was a 2003 contract? Correct. It wasn't open and shut to me. I inferred from the word net profit that they're probably talking about an annual bonus because usually that's how books are done. And month to month, it's just too manipulative. But it didn't say annual. And I think that's why it's important to note that the procedural posture of this case where it was not decided on summary judgment, it wasn't decided based on the language of the contract. I went to trial. At trial, we were able to develop those facts and the key facts that came out. The issue at trial, though, is the jury was instructed if he didn't get fired, if he quit voluntarily, no bonus. And it looks as though no argument was made then and no instruction was given then and no, that would enable the jury to give him his percentage of the net profits through July 8th or whatever it was that he quit. Well, there was certainly an argument from Mr. Churchill that he was entitled to the bonus because of this concept of anticipatory breach. I think that's why the jury instructions as given were fair in that you had the concept of anticipatory breach and you had this concept of whether it was voluntary or not, which is directly out of the case law. And it allowed both parties to argue their theories of the case. Our theory was that Mr. Churchill voluntarily resigned because he wanted more money, basically. Mr. Churchill said, no, I resigned because I was forced to because of this supposed conversation. You had an expert who testified, and I guess the jury must have bought it, that he wound up being better off because they breached, he didn't get what they promised him, and he left. What was the basis for that? The basis of that was that we had testimony first from the accountant who structured the deal and then our own economic expert that basically said there was the initial deal, which was based on stock, but the fact that we carefully put together this new agreement where there was going to be these new higher annual bonuses, very high, 32% of the net profit, which would replace the economic value of that stock. And the economist's theory was that basically it's better to have cash in hand rather than this stock that somewhere down the road could be worth something. And I think what was important... You would have always had a minority interest in the stock? Correct, up to 20%. When I did estate planning, we didn't use the term Q-tip trust. We used marital deduction trust, and then a save-the-second-tax trust. The marital deduction was basically half, and the other half was to the kids for stirpies with a life interest or not, but a right to invade for specified purposes for the surviving spouse. Is a Q-tip trust different from one of those? You know, Honor, I'm going to have to claim ignorance on this one. As an employment lawyer, I had to get up to speed on even the words of the Q-tip trust. The reason I asked is I was thinking any accountant would testify that a minority interest in a small business is basically worthless because you can't sell the stock. And that's right, and our economist did testify to that very point, and that was taken into account in valuing how much that 20% was worth versus the cash in hand with these large annual bonuses. I'm looking again at ER 126. This is the instruction you pointed me to. Does California Civil Code 1440 or any of the cases interpreted require a person in Churchill's circumstance to establish that he would perform the terms of the contract? I think so. I think it does. I've got 1440 right in front of me, and I don't see it in there. And I didn't read it in the Kelly case or in Romano. Where is it?  A victim of anticipatory breach has to establish that they would have been able to perform under the contract. Well, I think implied in it is that both sides are going to come to a contract and perform a contract. And I think in this case where... Listen, I have no problem if this jury had said there was no contract. You don't owe him anything. There was no contract. He never came to a meeting of the minds. Statute of frauds wasn't complied with, et cetera. But once they got past the point, and they must have, because they found that Winter Chevrolet had breached the contract, right? Correct. So my question is the same. Where in 1440 are the cases interpreting it is a requirement, as this instruction told the jury, that Churchill had to be able to perform under the contract? Because, again, I think the implication is that both sides are going to come to the contract and be able to perform. In this case, there was a question about whether they could perform. And I think, you know, it's easy to speculate now, but I think the reason the jury came to the conclusion that it did is to say, yeah, technically there was a breach. He didn't get that 20 percent of stock initially. He got something different, which obviously the jury believed was of more value. Well, let me put the question this way. Did the instruction that said 126 of the ER place a burden on Churchill that the law doesn't place on him? I believe it does, Your Honor. Okay. Because I believe that he did have an obligation to perform under the contract. Thank you. Thank you. What happened to the parts of the bonus he had already received? He received those. And I think the question earlier was a good one about what could happen with those. And I think it's common in the car dealership business to have what are called draws, especially when you have someone who's compensated, you know, this way with large commissions. And he was given those amounts. Mr. Payne, the accountant, testified at trial that the reason for that was essentially to give him something as he goes along so he doesn't have to wait until the end for this one large payout. What I'm trying to find out is what the theory is that enabled the jury to say Winter Chevrolet breached, but he was not harmed, and they did not owe a bonus which was not paid. Well, I think it was because there was a technical breach in that he was not given the 20% of stock that he originally signed up for because of the impossibility with the Q-tip trust. So you think the breach was the 20% of the stock? I think so. And, you know, it's hard for us to deny that because we didn't give him the 20% of stock. But we basically said the circumstances changed, the parties worked together, they entered into a new agreement whereby that stock bonus as originally contemplated were replaced by these large annual bonuses. And our economist testified that those annual bonuses were actually worth more to Mr. Churchill. And so it's my conclusion that the jury looked at that. Was it put to the jury in any way to determine whether the contract was for annual bonuses? It was not. It was not. Thank you, counsel. Thank you. Counsel, although you went over your time, we asked questions and brought your adversary over his time, so why don't you take a minute for rebuttal? I'll be as brief as I can. Page 67, I had a chance to look. And what happened on the jury instructions is the court ordered us to prepare, I mean the verdict forms, to prepare a joint verdict form. And we did. And the one on page 67 was the product of negotiation. I wanted stronger language. Mr. Cliff wanted other language. And we negotiated on two with did David Churchill resign his employment voluntarily and without justification, which brings in the anticipatory breach of the contract. I just wanted to clarify that. The judge rejected that, the joint verdict form that we proposed, and prepared his own verdict forms, which you were looking at. Judge Seinfeld asked your opponent if you had argued for the, I'll call it, the January to July portion. Did you? We had some argument in chambers, and it must have been at the pretrial, too. So there was argument about it, and the end result was we couldn't agree on a formula. And so the jury, we were going to let the jury decide whether there was a bonus owing. Did you argue that to the jury? No. The jury was only to decide whether a bonus was owing. And I may have missed it. Was it anywhere in your briefs? About the? Proportional. January to July. I don't believe so. Because it came as sort of a surprise to me this morning. Oh, I think, well, we argued in chambers. And my recollection is that we were talking about a proration because he wouldn't have... He could make an argument that he was entitled to the annual bonus, but I don't like it. He did leave in July. Well, thank you for your forthrightness. Thank you, counsel.
judges: Nelson, Kleinfeld, Hawkins